**In re ARGONAUT FINANCIAL
SERVICES, INC., Debtor.**

No. C–93–2286 EFL.
Bankruptcy No. 92 42551.

United States District Court,
N.D. California.

Jan. 26, 1994.

R. Kenneth Bauer, Walnut Creek, CA, for appellees.

Bruce Cornelius, Graves, Allen, Cornelius, & Celestre, Oakland, CA, for appellants.

### ORDER REVERSING BANKRUPTCY COURT

LYNCH, District Judge.

### I. INTRODUCTION

Before this Court on appeal come Investors,[1] some of 69 people and entities who

---

1. This Court notes that many of these Investors are currently before Judge Legge in the Northern District as well in a case numbered C–93–1677 CAL. In that case, Investors seek certification as a class and a declaration that they hold valid security interests in the lease or a declaration that the lease at issue is not a "lease" as that term is included in Bankruptcy Code section 365(d)(4). This order in no way determines any of those issues. Rather, this Court sits only in review of the Bankruptcy Court on appeal. However, it is necessary to reach and decide the adequacy of notice issue, while recognizing that this was also raised before Judge Legge in the form of a declaratory relief request. The Bankruptcy Court's rejection of Investors' notice argu-

claim some property right in a leasehold interest held by Debtor at the time of the Chapter 11 filing. This appeal is opposed by Lessors, two individuals who own the remaining fee simple interest in the leased property and were the lessors to the Debtor of the property in issue.

Investors appeal from an Order of the Bankruptcy Court declaring, *inter alia,* that section 365(d)(4) of the Bankruptcy Code—11 U.S.C. § 365(d)(4)—has run against them. This Court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a).

## II. BACKGROUND

For the purpose of this appeal, the statement of facts set forth by Investors in their opening brief is largely unopposed.

On or about December 8, 1964, Peter and Mary John entered into an agreement ("Ground Lease") with Oakland Hospital Corporation whereby the Johns agreed to lease the real property commonly known as 2700–2722 East 14th Street, Oakland, California to Oakland Hospital Corporation for a period of 99 years. The Ground Lease provided that the Lessee had the right to remove existing buildings and construct new buildings on the leased premises. Such construction was undertaken by a predecessor in interest to Argonaut (the Debtor) and a medical office building was built on the leased premises. Later, Lessors Sagredos and Antonis purchased the fee interest in the leased premises and succeeded to the Johns' interest in the Ground Lease.

On or about December 1, 1988, Argonaut's immediate predecessors in interest, Ray Castor and David and Susan Self, executed a promissory note in favor of Del Mar of Nevada, Inc. ("Del Mar") in the principal sum of $1,500,000. As security for this note, Castor and the Selfs executed a first deed of trust purportedly encumbering some interest in either the land or the leasehold interest under the Ground Lease. Later, Castor and the Selfs borrowed an additional $200,000 from Del Mar. That Loan was evidenced by a second promissory note and a second deed of trust, purportedly also encumbering some

interest in either the land or the leasehold interest.

Del Mar Commerce Company ("Commerce") is the trustee under both of the deeds of trust.

Del Mar subsequently assigned fractional interests in the notes and deeds of trust to 69 individuals and entities (many of whom have appeared as appellants in this case), which assignments were recorded in the official records of Alameda County.

Castor and the Selfs assigned their interest in the Ground Lease to Argonaut (a corporation of which Castor was then President) on September 17, 1991. Castor immediately defaulted on his loan payments on the two notes. On December 18, 1991, at the request of Investors Norkus, Oak View, Burnstein, and Buran ("Receivership Investors"), the Alameda Superior Court issued its Order Appointing and Instructing Receiver and Preliminary Injunction, with respect to the leased premises. This Order appointed Frank Satterwhite as the receiver of the leased premises, and he took possession and control of the medical building on or about December 18, 1991.

On December 19, 1991, both Del Mar and Commerce filed petitions under Chapter 7 of the Bankruptcy Code.

On April 8, 1992, an involuntary Chapter 7 petition was filed against Argonaut, which case was converted to a voluntary Chapter 11 by order of the Bankruptcy Court in May, 1992.

The Receivership Investors learned of the assignment of the Ground Lease to Argonaut and of Argonaut's bankruptcy proceeding by way of their participation in the receivership action. It is undisputed that the other 65 fractional assignees of Del Mar's interest never received actual notice of the assignment of the Ground Lease to Argonaut or of Argonaut's bankruptcy proceedings until after September 17, 1992, the date upon which, according to this Bankruptcy Court, § 365(d)(4) had conclusively run.

On or about August 25, 1992, Argonaut caused a motion to be filed in the Chapter 11

ment was fundamental to its order here appealed from.

case for an extension of time to assume or reject executory contracts and unexpired leases. At the time that this motion was filed, the last day to assume or reject such agreements was September 17, 1992, pursuant to a prior order of the Bankruptcy Court. Although Argonaut's attorney Duane Tucker intended to include it in the August 25, 1992 motion, the Ground Lease was inadvertently omitted from the list of leases for which an extension of time was being requested. On September 2, 1992, the Bankruptcy Court granted Argonaut's motion to extend time for assumption or rejection of those leases and contracts included in the motion.

The Bankruptcy Court appointed a Chapter 11 Trustee for Argonaut on or about September 25, 1992. On October 30, 1992, the Trustee filed a motion requesting a further extension of time to assume or reject executory contracts and unexpired leases. The Ground Lease was included in that motion.

Lessors opposed the Trustee's motion to extend time with respect to the Ground Lease on the basis that said lease was deemed rejected by operation of law under Bankruptcy Code § 365(d)(4) on September 17, 1992, since it had not been included in the earlier motion and order extending time for assumption or rejection. The Trustee agreed with Lessors, and the Bankruptcy Court entered an order denying this extension for the Ground Lease on that basis on December 30, 1992.

The Receivership Investors brought a motion under Bankruptcy Rule 9024 requesting that the Bankruptcy Court vacate the December 30, 1992 order and amend the September 2, 1992 order extending time to accept or reject leases, *nunc pro tunc*, to include the Ground Lease. Included with this motion were declarations by nine other Investors that they had received no notice of the Argonaut bankruptcy proceedings. Lessors also moved for reconsideration of the December 30, 1992 order and requested that the Bankruptcy Court amend that order to declare that the Ground Lease was terminated and that therefore any security interest in the leased premises was extinguished.

On February 11, 1993, the Bankruptcy Court denied the arguments of both the Investors present and the Lessors. On February 23, 1993, the Bankruptcy Court issued its written order.

First, the Bankruptcy Court addressed Investors' argument that 365(d)(4) could not have run to their detriment because they were not given notice of the bankruptcy. The Bankruptcy Court ruled that "the Investors have not established that they are creditors of the debtor. All they have shown is that they are assignees, and perhaps creditors, of Del Mar, the deed of trust beneficiary." Further, "Even if the Investors could show that they are creditors of the debtor, it is undisputed that a number (although not all) of them had retained [an attorney] prior to the filing of debtor's Chapter 11 case to protect their rights" and that "many of the Investors, all of whom are similarly situated, were actively involved in the bankruptcy case, personally and through their counsel, before the assumption period expired." The Bankruptcy Court concluded: "Under these circumstances, the Investors cannot claim a due process violation." Bankruptcy Court Order of February 23, 1993, at 7–8.

Next, the Bankruptcy Court considered an argument by the Investors who had been participating in the bankruptcy proceedings that they should be allowed retroactive relief to file a motion for abandonment even after the 365(d)(4) period had elapsed because of their excusable neglect in missing the filing deadline. Specifically, these Investors argued that their attorney was misled by affirmative misrepresentations by Mr. Tucker, who was representing the estate before the appointment of a trustee, that an extension of time to accept or reject the Ground Lease had been included in either the motion of August 25, 1992 or the Bankruptcy Court order of September 2, 1992 granting that motion. The Bankruptcy Court rejected these Investors' excusable neglect argument and denied them relief: "Even assuming that Tucker made this representation, ... the Investors' justifiable reliance has not been established." *Id.* at 8. Further, "allowing Mr. Tucker's alleged misrepresentation to be the functional equivalent of a court ordered

extension of time would be contrary to the purpose of section 365(d)(4) and would eliminate or impair the bankruptcy court's control over extensions of the time limit provided thereby." *Id.* at 9. Finally, the Bankruptcy Court noted that "it is doubtful that the court has the discretion to provide retroactive relief to the investors." *Id.*

The motion by Lessors was also denied: a ruling that has not been appealed to this Court.

### III. DISCUSSION

On appeal, Investors argue that the 65 assignees who received no notice of the Bankruptcy proceeding cannot be detrimentally affected by the running of section 365(d)(4) consistent with the Due Process Clause of the United States Constitution. Investors also argue that the Bankruptcy Court applied an erroneous legal standard before rejecting the excusable neglect claim raised by the 4 Investors who had received sufficient notice.

This Court agrees with both arguments and thus reverses the Bankruptcy Court Order of February 23, 1993.

### A. THE INVESTORS WHO RECEIVED NO NOTICE

■ The Due Process Clause of the United States Constitution applies to proceedings under the Bankruptcy Code. *Bank of Marin v. England,* 385 U.S. 99, 102, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966); *In re Center Wholesale, Inc.,* 759 F.2d 1440, 1448 (9th Cir.1985) (hereinafter *"Center Wholesale"* ); *In re Hobdy,* 130 B.R. 318, 320 (9th Cir. BAP 1991). Due Process requires that before a party suffers permanent legal detriment to a property interest resulting from some state action, that party generally must be accorded notice and an opportunity to be heard. *Tulsa Professional Collection Services, Inc. v. Pope,* 485 U.S. 478, 484, 108 S.Ct. 1340, 1344, 99 L.Ed.2d 565 (1988). The loss of a cause of action or a potential property interest can be sufficient for requiring notice to satisfy due process. *Id.* at 485, 108 S.Ct. at 1344; *see also In re Drexel Burnham Lambert Group, Inc.,* 151 B.R. 674 (Bankr. S.D.N.Y.1993). The notice required depends upon the factual context in which it is to be given, *Center Wholesale,* 759 F.2d at 1448, but generally "actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party, whether unlettered or well versed in commercial practice, if its name and address are reasonably ascertainable." *Tulsa Professional* 485 U.S. at 485, 108 S.Ct. at 1344 (quoting *Mennonite Board of Missions v. Adams,* 462 U.S. 791, 800, 103 S.Ct. 2706, 2712, 77 L.Ed.2d 180 (1983)).

■ Investors here claim some property interest in the Argonaut Ground Lease. Though the Bankruptcy Court found that Investors' security interest was incorrectly described as encumbering the fee interest (which Argonaut's predecessors-in-interest had no right to encumber) as opposed to the leasehold, it is clear that these Investors would have at least a very strong case for an equitable lien on the leasehold interest. *In re Destro,* 675 F.2d 1037, 1039 (9th Cir.1982); *see also Angeles Real Estate Co. v. Kerxton,* 737 F.2d 416, 420 (4th Cir.1984). To say that these Investors established no interest and were therefore deserving of no notice begs the question, where the absence of notice gave them no opportunity to appear before the Bankruptcy Court to establish their interest.

Clearly, there is some threshold of potentiality of claims beyond which notice would no longer be required. To determine what this threshold is, we can look to the Bankruptcy Code's notice provisions to establish the context in which notice is here being sought. *See Center Wholesale,* 759 F.2d at 1448. Bankruptcy Code section 342 requires that notice be given to any creditor of the debtor. *See also* Bankruptcy Rule 2002. The Code defines creditor to include any "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor"; claim means:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,

unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, . secured, or unsecured.

11 U.S.C. § 101.

"Claim against the debtor" includes a claim against the property of the debtor. 11 U.S.C. § 102(2).

Under these broad definitions, it is clear therefore that Investors—holders of either secured or unsecured potential equitable claims against property of Argonaut—qualify as creditors deserving of notice under the Bankruptcy Code.

■■ The type of notice required, as noted above, is dependant on the facts of each case. Generally, however, in bankruptcy cases, courts have found that known creditors are deserving of actual notice while unknown creditors are owed only publication notice. *See, e.g., Matter of Chicago, Milwaukee, St. Paul & Pac. R.,* 974 F.2d 775, 788–89 (7th Cir.1992), *In re Drexel Burnham Lambert Group, Inc.,* 151 B.R. 674, 679–82 (Bankr.S.D.N.Y.1993), *Walters v. Hunt,* 146 B.R. 178 (Bankr.N.D.Tex.1992), *In re Charter Co.,* 125 B.R. 650 (M.D.Fla.1991). Thus, the type of notice owing to these non-noticed Investors depends upon whether they were known or unknown creditors as those terms are understood under bankruptcy law. One court has said:

Known creditors are defined as creditors that a debtor knew of, or should have known of, when serving notice of the bar date. Among known creditors may be parties who have made a demand for payment against a debtor in one form or another before the compilation of a debtor's schedules. Typically, a known creditor may have engaged in some communication with a debtor concerning the existence of the creditor's claim. This communication by itself does not necessarily make the creditor known. Direct knowledge based on a demand for payment is not, however, required for a claim to be considered "known." A known claim arises from facts that would alert the reasonable debtor to the possibility that a claim might reasonably be filed against it.

*In re Drexel Burnham Lambert Group,* 151 B.R. at 681.

Because constitutional due process requires that actual notice be given a creditor who is "reasonably ascertainable," such a creditor must by necessity qualify as a "known" creditor under this line of cases. "Known" creditors can also include those about whose claims the debtor "should have known."

For a due process violation to have occurred, therefore, (1) Investors' names must have been "reasonably ascertainable" to Argonaut as parties with potential property interests at stake at the time of the bankruptcy, or (2) Argonaut must have been aware of such facts as to alert a reasonable debtor that these Investors might have a claim against it.

■ Here, Investors were assignees of Del Mar through a deed of trust on which Commerce was the trustee. Argonaut's predecessors (one of whom was the president of Argonaut at the time of the transfer to Argonaut) had dealt directly with Commerce and Del Mar in assigning the security interest in the leasehold. There is some evidence, including a declaration by Duane Tucker, Argonaut's attorney at the time of the filing, that Argonaut knew that the Del Mar interest had been further assigned to some other entities. In any event, it would have been easy for Argonaut to have learned of the assignment and gotten the list of assignees from either Del Mar or Commerce, if not from its own predecessors in interest. There is and was no secret regarding the identity of the assignees (indeed, *the assignment was even officially recorded in Alameda County* ). Under these circumstances, we hold that the Investors as creditors of the Argonaut estate were reasonably ascertainable to Argonaut, that Argonaut should have known of the possibility of such claims, and that these Investors were therefore deserving of actual notice of the Bankruptcy proceedings under the Due Process Clause of the United States Constitution.

Lessors claim that due process is not implicated in this case because the time period in section 365(d)(4) runs without anything having been done by a state actor, and that therefore it should be treated as a self-executing statute of limitations. The running of a self-executing statute of limitation does not implicate state action enough for the Due Process Clause—which governs only state actions—to be relevant. *See Tulsa Professional*, 485 U.S. at 485–86, 108 S.Ct. at 1344–45. Lessors attempt to support this argument by citing to *In re Arizona Appetito's Stores, Inc.*, 893 F.2d 216, 219 (9th Cir.1990), in which the Ninth Circuit described section 365(d)(4) as "self-executing." Lessors argue that since this statute is self-executing, the failure to give notice was a purely private action and is therefore not actionable under Due Process analysis.

This argument fails. The case before us is squarely controlled by the Supreme Court decision in *Tulsa Professional*. The *Arizona Appetito* reference to "self-executing" was in a different context. The Ninth Circuit did not—nor could it under *Tulsa Professional*—hold that section 365(d)(4) is a self-executing statute of limitations. Rather, the *Arizona Appetito* language only establishes that once the period begins to run, it runs to completion without a court order declaring that it has run. This language in no way contemplates "self-executing" as that term of art is used in due process notice cases to refer to the quantum of state action necessary to implicate due process.

In *Tulsa Professional*, the Supreme Court considered Oklahoma's Probate Code's nonclaim statute, under which claims against a probate estate had to be brought within two months of the first publication of notice to creditors. This notice to creditors would occur only after the probate court had appointed an executor. Under the statute, notice by publication in a county newspaper was sufficient to start the period running. Any claim not brought within the period was generally forever barred. Plaintiff Tulsa Professional Collection Services was a successor in interest to a claim that a hospital had against a decedent based on charges incurred during his final illness. Plaintiff received no actual notice of the probate proceedings, and the two month period ran before plaintiff asserted any claim. The Oklahoma Supreme Court held this claim to be time barred, deciding that notice concomitant with Due Process was not required because there was insufficient state involvement in the running of this period. In effect, applying *Texaco, Inc. v. Short*, 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982), the Oklahoma Supreme Court decided that the pertinent probate section was a self-executing statute of limitations.

The Supreme Court reversed. It noted that "when private parties make use of state procedures with the overt, significant assistance of state officials, state action may be found." *Tulsa Professional*, 485 U.S. at 486, 108 S.Ct. at 1345. The Court observed that in the context of a self-executing statute of limitations, "The State has no role to play beyond enactment of the limitations period"; while here, in contrast, "there is significant state action. The probate court is intimately involved throughout, and without that involvement the time bar is never activated. The nonclaim statute becomes operative only after probate proceedings have commenced in state court." *Id.* at 486–87, 108 S.Ct. at 1345–46. The Court concluded:

> Where the legal proceedings themselves trigger the time bar, even if those proceedings do not necessarily resolve the claim on its merits, the time bar lacks the self-executing feature that **Short** indicated was necessary to remove any due process problem. Rather, in such circumstances, due process is directly implicated and actual notice generally is required.

*Id.* at 487, 108 S.Ct. at 1346 (emphasis added). Thus, "We hold that Oklahoma's nonclaim statute is not a self-executing statute of limitations. Rather, the statute operates in connection with Oklahoma's probate proceedings to 'adversely affect' appellant's property interest. ... If appellant's identity as a creditor was known or 'reasonably ascertainable,' then the Due Process Clause requires that appellant be given 'notice by mail or other means as certain to ensure actual notice.'" *Id.* at 491, 108 S.Ct. at 1348 (*quoting*

*Mennonite*, 462 U.S. at 800, 103 S.Ct. at 2712).

In this case, the 60–day period of section 365(d)(4) begins to run only upon a filing in bankruptcy court of a petition for relief. *See In re Elm Inn, Inc.*, 942 F.2d 630, 633 (9th Cir.1991), *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, at 1079 (9th Cir.1989) ("Debtor's petition for Chapter 11 bankruptcy ... constituted relief under 11 U.S.C. § 301 and so commenced the 60–day period" of section 365(d)(4)). Section 365(d)(4) then operates "in connection with" the Bankruptcy Code to "adversely affect" a party's property interest. *See Tulsa Professional*, 485 U.S. at 491, 108 S.Ct. at 1348. Indeed, the entire bankruptcy proceeding is undertaken in intimate association between the private party debtor and the state actor bankruptcy court. Since the 60–day period begins to run not upon the happening of some purely private occurrence—which is what a self-executing statute of limitations does—but rather runs only upon the intervention and participation of a state actor in the form of the bankruptcy court, it is clear that the time restriction in section 365(d)(4) is not a self-executing statute of limitations but is rather directly parallel to the nonclaim statute at issue in *Tulsa Professional.* Thus, actual notice is required before this period can run to the detriment of any party who is reasonably ascertainable or whose claim should be known of by the debtor.

As noted above, those Investors without notice were deserving of actual notice. First, they were "creditors" of the Argonaut estate as that term is understood in the Bankruptcy Code. Second, they had a clear property right (even if only an equitable lien or a cause of action) that could be adversely affected [2] by the bankruptcy proceedings. Third, they were reasonably ascertainable at the time of the filing. Fourth, it is undisputed that these Investors received no actual notice of the Argonaut bankruptcy until after the 365(d)(4) period had run. Fifth, state action is implicated. Under these circumstances, these Investors would be deprived of due process of law if the Bankruptcy Court's opinion that 365(d)(4) had run to their detriment were allowed to stand.[3]

There is language in the Bankruptcy Court order of February 23, 1993, to the effect that (1) notice to the attorneys for the Receivership Investors should also count as notice to those Investors who had no notice of the Argonaut bankruptcy, and (2) the participation of the Receivership Investors should bind the Investors without notice because all Investors are similarly situated. These conclusions are defeated by the simple requirement under Supreme Court jurisprudence that where parties' names and addresses are reasonably ascertainable, actual notice to these parties is constitutionally required. *See Tulsa Professional* at 484–85, 108 S.Ct.

---

**2.** By its express terms, the running of the 60 day period in section 365(d)(4) means that a lease is "deemed rejected." This means as a matter of law that the lease is also "terminated" as between the lessor and the lessee/debtor, and that the lessee/debtor "no longer has any right, title or interest in the lease or its proceeds." *In re Lovitt*, 757 F.2d 1035, 1041 (9th Cir.1985). *Accord, In re Elm Inn, Inc.*, 942 F.2d 630, 633 (9th Cir.1991), *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1080–81 (9th Cir.1989). The effects of this termination on any third party's security interest are unsettled under Ninth Circuit law, but at least two courts within this circuit have held that the termination of a lease under 365(d)(4) strips away all security interests from that lease. *In re Gillis*, 92 B.R. 461, 465–66 (Bankr.D.Haw.1988), *In re Bernard*, 69 B.R. 13, 15–16 (Bankr.D.Haw.1986); *See also In re Elm Inn, Inc.*, 942 F.2d 630, 633–35 (9th Cir. 1991) (suggesting in *dicta* that the holder of a security interest in a leasehold would only be able to pursue that interest upon a finding that

the leasehold was not part of the estate of the debtor and was not thus affected by the running of section 365(d)(4)). Without deciding this question of law, this Court simply holds that these Investors should not be exposed to this risk when they could have protected themselves had they been given adequate notice. *See, e.g., In re Bernard*, 69 B.R. at 15–16 (noting that the security interest holder could have brought a motion to compel abandonment of the lease under section 554 prior to the running of the 60–day period and thus removed the lease from the operation of section 365(d)(4)).

**3.** This does not affect the effectiveness of the 365(d)(4) limitations as to any party who had notice of the Argonaut bankruptcy. As for those parties, in the absence of any other effective defense, the 365(d)(4) period ran conclusively when the September 17, 1992 date passed without any extension having been granted prolonging the period in which to accept or reject this lease.

at 1344–45. To the extent that these conclusions suggest an agency relationship between the non-noticed Investors and either the Receivership Investors or their Attorney, such a finding of fact is clearly erroneous as there is no evidence to suggest such an agency relationship.[4]

■■■ Even admitting that these Investors received inadequate notice, Lessors further argue that the Bankruptcy Court was powerless to grant Investors relief from the operation of section 365(d)(4). Citing to *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1080 (9th Cir.1989) (noting that section 105(a) of the Code "does not empower courts to issue orders that defeat rather than carry out explicit provisions of the Bankruptcy Code such as section 365(d)(4)"), Lessors claim that courts lack the equitable power to remedy a lack of notice by denying the operation of section 365(d)(4).

■■■ This argument fails. Even if *Sea Harvest* stood for the proposition that section 105(a) could *never* be used to invalidate the running of 365(d)(4)—which is entirely questionable when there exists a competing explicit provision of the Code requiring notice to creditors—the Bankruptcy Court below and this Court now have been asked to trump 365(d)(4) not simply under the Code but rather on the basis of a violation of the United States Constitution. It is quite clear that both the Bankruptcy Court and this Court have the power to fashion equitable remedies in response to a constitutional violation, even in the absence of explicit empowerment by the Bankruptcy Code. As the Sixth Circuit eloquently stated in *U.S. v. Cardinal Mine Supply, Inc.*, 916 F.2d 1087 (6th Cir.1990):

> The failure of the Bankruptcy Rules to provide relief to creditors who receive no notice of a bankruptcy and have no knowledge of it cannot deprive those creditors of their substantive right not to have their property rights taken away without notice. Bankruptcy Courts are courts of equity and can provide a remedy when there is a substantive right.

*Cardinal Mine* at 1091.

In a similar vein, the Ninth Circuit has stated that "as courts of equity, bankruptcy courts 'will look through the form to the substance of any particular transaction and may contrive new remedies where those in law are inadequate.' " *In re Global Western Development Corp.*, 759 F.2d 724, 727 (9th Cir.1985). Thus, both this Court and the Bankruptcy Court have and always have had the clear authority to remedy a constitutional violation by overriding section 365(d)(4) or any other section of the Bankruptcy Code.[5]

A common remedy in bankruptcy cases for creditors who received no notice and then had a limitations period run to their detriment has been to allow such creditors to file otherwise-time-barred motions as if the limitations period had never run. *See, e.g., Sheftelman v. Standard Metals Corp.*, 839 F.2d 1383, 1387 (10th Cir.1987); *In re Hobdy*, 130 B.R. 318 (9th Cir. BAP 1991); *In re Blumer*, 66 B.R. 109 (9th Cir. BAP 1986); *In re Bilder*, 108 B.R. 666, 667 (Bankr.E.D.Wis. 1989). As the court in *In re Bilder* noted: "In granting this opportunity, the court is not extending the time period for the New Creditors to act because, as a practical matter, no effective time periods in which they could act have ever been set." 108 B.R. at 667.

This Court holds that since section 365(d)(4) has not run against the non-noticed Investors, these people should be allowed 60 days in which to file whatever motions they could otherwise have filed prior to September 17, 1992. The running of section 365(d)(4) and the resulting rejection and termination of the lease cannot be raised as a defense to any such motion brought by these Investors. Thus, these Investors can bring a

---

4. This Court, of course, reviews the Bankruptcy Court's conclusions of fact under the "clearly erroneous" standard and subjects its conclusions of law to a *de novo* review. *In re Commercial Western Finance Corp.*, 761 F.2d 1329, 1333 (9th Cir.1985).

5. This Court does not, of course, hold that section 365(d)(4) is unconstitutional. Rather, we hold that the operation of this statute against these Investors without first giving them adequate notice violates the Constitution by potentially depriving them of a property interest without due process of law. It is the failure to notify, in conjunction with the state action affecting property rights, that makes this operation unconstitutional.

motion under section 554 to compel the abandonment of the Ground Lease [6] by the estate to the Debtor, upon which the Lessors and any persons claiming security interests in this lease can pursue their claims against the Debtor unimpeded by the automatic stay. *See* Bankruptcy Code § 554, *In re Gantt,* 98 B.R. 770 (Bankr.S.D.Ohio 1989) (interested party may seek court order to compel trustee to abandon property), *In re Bernard,* 69 B.R. 13, 15–16 (Bankr.D.Hawaii 1986) (security interest holder in debtor's leasehold could bring such a motion prior to the running of the 60 day period to avoid the operation of section 365(d)(4)), *In re Dewsnup,* 908 F.2d 588, 590–91 (10th Cir.1990) (noting that "Property abandoned under this section ceases to be part of the estate" and "reverts to the debtor and stands as if no bankruptcy petition was filed," meaning that "whoever had the possessory right to the property at the filing of the bankruptcy again acquires that right.") The issue of whether Investors' claimed security interest in the leasehold is valid is beyond the scope of this appeal and is being currently contested in other legal proceedings. This Court simply holds that these non-noticed Investors cannot have lost their interests, if any, in the Ground Lease under federal law as a result of the operation of Bankruptcy Code section 365(d)(4) and the resultant termination of the Ground Lease, provided they bring their motion to compel abandonment or other effective motion within 60 days of this Order.[7]

## B. THE INVESTORS WHO HAD RECEIVED NOTICE OF THE BANKRUPTCY

 These four Investors—earlier referred to as the Receivership Investors—also seek relief from the running of section 365(d)(4). They claim that though they had notice of the Argonaut bankruptcy, they should be granted relief from the running of section 365(d)(4) because their failure to timely file a motion to compel the abandonment of the Ground Lease before the Lease was "deemed rejected" was the result of excusable neglect on the part of their attorney. Specifically, they claim that their attorney was misled by the attorney for Argonaut into believing that the Ground Lease had been included in the motion to extend time for rejecting or assuming leases that was filed on August 25, 1992 and in the order granting such extension dated September 2, 1992. Thus, they effectively seek amendment of the Bankruptcy Court Order of September 2, 1993, which did not include the Ground Lease as one for which time to accept or reject was extended, and they appeal the subsequent orders denying them relief from that order on the basis of excusable neglect. Alternatively, they seek leave to file an otherwise time-barred motion to compel abandonment because of their excusable neglect in missing the original filing deadline.

As noted above, the Bankruptcy Court rejected their argument on two bases: (1) that these Investors' attorney could not establish justifiable reliance upon Argonaut's attorney's misrepresentations, and (2) that allowing such misrepresentations to be the functional equivalent of a court ordered extension of time would divest the Court of its power to control the granting of extensions under 365(d)(4).[8]

While the Bankruptcy Court's reasoning is sound, it appears to have not applied the

---

**6.** This Court notes that the Ground Lease has already in fact been abandoned by the estate.

**7.** This Court notes that not all of the 69 investors are parties to this appeal. The 60–day period will only start to run against those investors not privy to this appeal upon their notice of this Order (and, of course, of the Argonaut bankruptcy). Notice of this Order and of the Argonaut Bankruptcy should be provided by the Bankruptcy Court to those investors who are not parties to this appeal in an appropriate manner as soon as is practicable.

**8.** As an alternate ground for its decision, the Bankruptcy Court found that it lacked the authority to allow excusable neglect to defeat the operation of section 365(d)(4), because excusable neglect is an equitable principle. For authority, the Bankruptcy Court (as well as the Lessors before this Court) relied on the *Sea Harvest* case. 868 F.2d 1077 (9th Cir.1989). This Court disagrees. The *Sea Harvest* case does not control here. *Sea Harvest* involved the interaction of Bankruptcy Code section 105 with 365(d)(4). Section 105 is a general provision allowing bankruptcy courts to issue equitable orders to effectuate provisions and purposes of the Bankruptcy Code. *Sea Harvest* held only that this section could not be used to override an express provision of the Code such as section 365(d)(4). Ex-

 

correct legal standard in considering excusable neglect and as a result this Court must reverse on this ground as well. In the recent Supreme Court opinion of *Pioneer Investment Services Co. v. Brunswick Associates,* — U.S. —, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993), the Court determined what standards a court should consider in allowing or rejecting an excusable neglect claim. Though this case was decided after the date of this Bankruptcy Court's ruling, it implicitly approved of a broad equitable approach to excusable neglect, such as the approach set forth by the Ninth Circuit and the Ninth Circuit Bankruptcy Appellate Panel in *In re Magouirk,* 693 F.2d 948, 951 (9th Cir.1982) and *In re Dix,* 95 B.R. 134, 138 (9th Cir. BAP 1988). These cases, which were in effect at the time of the Bankruptcy Court's ruling, require that a court consider:

> (1) whether granting the delay will prejudice the debtor; (2) the length of the delay and its impact on efficient court administration; (3) whether the delay was beyond the reasonable control of the person whose duty it was to perform; (4) whether the creditor acted in good faith; and (5) whether the clients should be penalized for their counsel's mistake or neglect.

*In re Magouirk* at 951, *In re Dix* at 138.

The Bankruptcy Court below did not articulate its evaluation of these Investors' claim under the standards required by the Ninth Circuit. While expressing no opinion on the strength or weakness of these Investors' claims under the applicable legal standard, this Court remands to the Bankruptcy Court to reconsider this claim in light of these factors.

### IV. CONCLUSION

Therefore, the Bankruptcy Court order of February 23, 1993 is REVERSED, and this case is remanded for proceedings consistent with this Order.

---

cusable neglect, to the contrary, is a particular and limited doctrine specifically provided by the Bankruptcy Rules (*see, e.g.,* Rules 9006 and 9024) to attack judgments or orders that are necessarily carrying out other provisions of the Bankruptcy Code. Excusable neglect thus serves a function distinguishable from that served by section 105.

As the Supreme Court noted in *Pioneer Investment Services v. Brunswick Associates,* — U.S. —, — — —, 113 S.Ct. 1489, 1494–95, 123 L.Ed.2d 74 (1993), "by empowering the courts to accept late filings 'where the failure to act was the result of excusable neglect,' Rule 9006(b), Congress plainly contemplated that the courts would be permitted, where appropriate, to accept late filings caused by inadvertence, mistake, or carelessness." Thus, the Bankruptcy Court has, in an appropriate case, the authority to permit an otherwise 365(d)(4)–barred motion where the late filing was the result of excusable neglect.