### In re FARMLAND INDUSTRIES, INC., et al., Debtors.

### No. 02–50557–JWV.

United States Bankruptcy Court, W.D. Missouri.

Sept. 17, 2002.

---

Cynthia Dillard Parres, Laurence M. Frazen, Mark G. Stingley, Robert M. Thompson, Bryan Cave, LLP, Kansas City, MO, Frank W. Lipsman, Bryan Cave, LLP, Overland Park, KS, Ronald S. Weiss, Berman, DeLeve, Kuchan & Chapman, Kansas City, MO, for Farmland Industries, Inc.

Jerry L. Phillips, Paula C. Acconcia, Kansas City, MO, for Office of U.S. Trustee.

Bruse E. Strauss, Thomas N. Lane, Merrick, Baker & Strauss, Kansas City, MO, Robert S. Blanc, Houston, TX, for American Plant Food Corp.

Thomas M. Franklin, Kansas City, MO, for Equalizer, Inc.

Christopher A. Artzer, Akin, Gump, Strauss, Hauer & Feld, Houston, TX, Christopher J. Redmond, Gary D. Barnes, Husch & Eppenberger, Kansas City, MO, Henry J. Kaim, S. Margie Venus, Houston, TX, for Official Committee of Unsecured Creditors of Farmland Industries, Inc.

Daniel J. Flanigan, James E. Bird, Polsinelli, Shalton & Welte, PC, Kansas City, MO, Kathleen R. Pasulka–Brown, Mark L. Prager, Michael J. Small, William J. McKenna, Foley & Lardner, Chicago, IL, for Official Committee of Bondholders of Farmland Industries, Inc.

## MEMORANDUM OPINION AND ORDER

JERRY VENTERS, Bankruptcy Judge.

On September 10, 2002, the Court held a hearing on the Motion (Document # 602) filed by the Debtor, Farmland Industries, Inc., ("Debtor") for Court approval of the sale of a fertilizer warehouse in Greenville, Mississippi, to American Plant Food Corp. ("American") for $2,120,500. However, at the hearing, United Agri Products, Inc., d/b/a UAP–MidSouth ("UAP"), by counsel, informed the Court and all parties present that UAP had a contractual right of first refusal to purchase the warehouse property, that UAP had not received notice of the Debtor's auction procedures to sell the property, and that UAP desired to exercise its right of first refusal and would match American's $2,120,500 bid. The Court heard arguments by counsel for the numerous parties present at the hearing, gave counsel an opportunity to submit legal citations to the Court for consideration, and took the matter under advisement.[1]

A brief background is helpful to an understanding of the present situation. On August 16, 2002, the Debtor filed its Motion (the "Sale Procedures Motion") for approval of sale of the warehouse property in Greenville to ConAgra Trade Group, Inc., ("ConAgra Trade Group") for $1,420,000. The Sale Procedures Motion proposed the adoption of certain auction and bid procedures that were to be fol-

---

**1.** Those present and presenting argument included the Debtor, the Unsecured Creditors Committee, the United States Trustee, the Bondholders Committee, and Deutsche Bank (the agent for the primary secured lenders). American, the high bidder, was not present at the hearing either by counsel or corporate representative.

lowed by the Debtor in soliciting additional bids from prospective purchasers and possibly obtaining a higher price for the warehouse property. The auction and bid procedures were approved by the Court on August 29, 2002. (Document # 691). Those procedures provided that, if any additional written bids ("overbids") were received for the property, an auction would be conducted by the Debtor's attorneys in their law firm's offices on September 9, 2002, and the highest and best bid would be submitted to the Court for final approval at an omnibus hearing scheduled on September 10, 2002.

Two overbids were, indeed, received for the warehouse property, and counsel for the Debtor conducted an auction at his offices in the afternoon of September 9, 2002. According to counsel, the bidding was vigorous and competitive. There were 100 rounds of bids received, with the final bid being that of American for the abovementioned $2,120,500, an increase of $700,500 over the lead bid of ConAgra Trade Group. A representative and counsel for ConAgra Trade Group were present and participated in the auction, although ConAgra Trade Group dropped out of the bidding at about the $1,700,000 level. At the conclusion of the bidding on September 9, there was no question that American had made the highest bid at $2,120,500.

However, on the morning of September 10, 2002—just three or so hours before the scheduled hearing for approval of the sale—counsel for the Debtor became aware of UAP's right of first refusal. The right of first refusal was contained in a contract titled "Farmland Industries, Inc. Fertilizer Handling Agreement" entered into by Farmland Industries and UAP–MidSouth on August 14, 2001. Paragraph 17 of that Agreement provided:

"**PURCHASE OPTION:** During the initial term of this agreement [or the extended 3–year term], Farmland may not Transfer the Property (as respectively hereafter defined) to a person or entity other than UAP—Midsouth without first giving written notice to UAP—Midsouth 40 days before such Transfer that a Transfer will occur unless UAP—Midsouth exercises its right of first refusal within 30 days ('the Notice'). The Notice will disclose the terms and conditions upon which the Transfer will occur. Upon receiving the Notice, and only upon receiving the Notice, UAP—Midsouth may within the time prescribed above elect to compel Farmland to Transfer the property to UAP—Midsouth on the same terms and conditions. Farmland is not liable for any alleged failure to give the Notice with respect to any proposed Transfer which does not occur. The 'Property' shall consist of substantially all of the real property (to the extent Farmland owns it) and the buildings and equipment at Farmland's facility located at Greenville, Mississippi. A 'Transfer' consists of any sale or transfer of the Property for cash or its equivalent, by Farmland to any party other than a corporate affiliate of Farmland, including without limitation, Agriliance LLC. A Transfer excludes any assignment for the purpose of granting a security interest to a lender, and any resulting enforcement of such interest. A Transfer excludes any transaction in which the Property is less than the majority of the property included in the transaction, as determined by Farmland's depreciated book value of such property."

Counsel for the Debtor acknowledged that notice of the pending Motion and of the auction and bid procedures had not been given to UAP at any time, though he did not know if UAP had received actual

knowledge of the bid procedures. Counsel for UAP—who also represents ConAgra Trade Group—advised the Court that he did not believe that UAP had any knowledge, actual or constructive, of the Debtor's Motion or the sale procedures, or even that the Debtor was contemplating selling the warehouse property. At the conclusion of the hearing, the Court directed counsel for UAP to obtain and submit to the Court within 24 hours an affidavit from an authorized officer of UAP stating whether UAP had received notice of the sale procedures or whether UAP had actual knowledge of the pending sale and the sales procedures. The affidavit of Christopher K. Hildreth, vice president of UAP, was received by the Court by facsimile transmission on September 11, 2002. In it, Hildreth stated that, to his knowledge, neither UAP nor the individual designated in the Fertilizer Handling Agreement to receive notice for UAP (a person named Moses Vernon) had received a service copy of the Debtor's original Motion or a copy of the Court's Order approving the auction and bid procedures. Hildreth further stated that, to his knowledge, UAP did not have notice of the sale of the Greenville warehouse property until September 10, 2002, the day after the auction was conducted by Debtor's counsel.[2]

Despite the apparent lack of notice to UAP, several counsel urged the Court to approve the sale of the warehouse property to American at its bid of $2,120,500. Others urged the Court to reopen the bidding and allow further opportunity for bidding before approving the sale. After hearing arguments, the Court took the matter under advisement and promised the parties a prompt ruling, inasmuch as all parties seemed in agreement that time was of the essence.[3] The Court has reviewed the affidavits submitted by the parties, has reviewed the cases cited by the parties, and has conducted its own research and is now prepared to rule on the issues before it.

## DISCUSSION

It is generally accepted that it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed. *In re Gil–Bern Industries, Inc.*, 526 F.2d 627, 629 (1st Cir.1975), and cases cited therein. It is even more firmly established in our law that a person or entity may not be deprived of his or its liberty or property interests without due process of law; generally, actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party. *In re Center Wholesale, Inc.*, 759 F.2d 1440, 1448 (9th Cir.1985). It is these two principles that have come into conflict in this case.

With respect to the first issue, the Eighth Circuit Court of Appeals has provided guidance in cases such as this in *Four B. Corporation v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107

---

**2.** Toward the end of the hearing, the Court inquired of all counsel if they wished to present evidence either at that time or at a later time. Counsel did not indicate a desire to do so. The Court then directed that the affidavit be obtained from UAP and submitted to the Court within 24 hours, for the Court's consideration in ruling on the pending Motion. No objections were raised to this procedure.

**3.** In its Sale Procedures Motion, the Debtor stated that the Motion was being filed under "exigent circumstances" and requested an expedited hearing on it, as well as on several other similar motions filed at the same time.

F.3d 558 (8th Cir.1997) (*"Food Barn"*). As a general rule, the Court of Appeals observed that, "[t]ypically, a court will re-open bidding, and thereby upset the results of a properly conducted judicial auction, only if 'there was fraud, unfairness or mistake in the conduct of the sale...or...the price brought at the sale was so grossly inadequate as to shock the conscience of the court.'" *Food Barn*, 107 F.3d at 564, quoting *In re Stanley Eng'g Corp.*, 164 F.2d 316, 318 (3rd Cir.1947), *cert. denied*, 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417 (1948). Additionally, the Court stated that "an unwavering adherence to formality" was not desirable, and that a bankruptcy judge should not be "'shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code.'" *Food Barn*, 107 F.3d at 564, quoting *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1069 (2nd Cir.1983). A counterweight to these considerations, however, is that the court "must remain mindful of the ubiquitous desire of the unsecured creditors, and a primary objective of the Code, to enhance the value of the estate at hand." *Food Barn*, 107 F.3d at 564–65.

█ The Court of Appeals, following the lead of the First Circuit Court of Appeals in *Gil–Bern*, then adopted a "sliding scale approach" that could be followed by a bankruptcy court in determining whether to re-open the bidding at a bankruptcy estate sale. Under this sliding scale approach, "the importance of estate enhancement diminishes as an auction participant's reasonable expectations, and the gravity of finality, increase. At some point, such as

when the court actually enters an order approving the sale, expectations become sufficiently crystallized so as to render it improper to frustrate anticipated results except in the limited circumstances where there is a grossly inadequate price or fraud in the conduct of the proceedings." *Food Barn*, 107 F.3d at 565.

In *Food Barn*, not wholly unlike what occurred in this case, the debtor filed a motion with the bankruptcy court seeking approval of the sale of an estate asset (a grocery store), but at the hearing on approval of the sale a competing grocery store operator announced that it would pay substantially more for the property. Judge Koger of this Court then conducted an auction in open court and approved the sale of the property to the competing operator when the original buyer failed to match the competitor's high bid. As in this case, the original buyer had a contractual right to match competing bids, and Judge Koger scrupulously honored that provision. *See also Brink v. Payless Cashways, Inc. (In re Payless Cashways, Inc.)*, 281 B.R. 648 (8th Cir. BAP 2002).[4]

█ Turning to the issue of due process, very little discussion is required. The concept of due process is fundamental to our system of laws in the United States. "No person...shall...be deprived of life, liberty or property without due process of law." U.S. CONST. AMEND. V. There is no argument that the Due Process Clause applies to proceedings under the Bankruptcy Code. *Bank of Marin v. England*, 385 U.S. 99, 102, 87 S.Ct. 274, 276, 17 L.Ed.2d 197 (1966); *In re Center Whole-*

---

**4.** It should be noted that the *Food Barn* and *Payless Cashways* cases—unlike this case—did not involve the sale of property pursuant to court-approved auction and bid procedures that were established prior to the Debtor's attempted sale of the property. Nevertheless, the Court believes that the general principles and guidelines set out in *Food Barn* and followed in *Payless Cashways* are applicable in this case and should be followed insofar as possible.

*sale, Inc.,* 759 F.2d 1440, 1448 (9th Cir. 1985). Due process requires that before a party suffers permanent legal detriment to a property interest resulting from some state action, that party generally must be accorded notice and an opportunity to be heard. *Tulsa Professional Collection Services, Inc. v. Pope,* 485 U.S. 478, 484, 108 S.Ct. 1340, 1344, 99 L.Ed.2d 565 (1988); *In re Argonaut Financial Services, Inc.,* 164 B.R. 107, 111 (N.D.Cal.1994). The loss of a cause of action or a potential property interest can be sufficient for requiring notice to satisfy due process. *Tulsa Professional,* 485 U.S. at 485, 108 S.Ct. at 1344. The notice required depends on the factual context in which it is to be given. *Center Wholesale,* 759 F.2d at 1448. However, as a general rule, "actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of any party, whether unlettered or well versed in commercial practice, if its name and address are reasonably ascertainable." *Tulsa Professional,* 485 U.S. at 485, 108 S.Ct. at 1344 (quoting *Mennonite Board of Missions v. Adams,* 462 U.S. 791, 800, 103 S.Ct. 2706, 2712, 77 L.Ed.2d 180 (1983)).[5]

In the case now before the Court, it is clear to the Court that UAP never received either actual or constructive notice of the Debtor's Motion seeking approval of the auction and bid procedures for the sale of the Greenville warehouse, the Court's Order approving the auction and bid procedures, or of the auction being conducted on September 9, 2002, by the Debtor's attorneys. The Court is convinced that UAP did not learn of the impending sale of the Greenville warehouse until the morning of September 10, 2002, just shortly before the hearing scheduled at 1:30 p.m. that afternoon for final approval of the sale.

When these problems with the auction and sale surfaced at the hearing on September 10, the Court invited counsel for the parties to submit evidence either at that time or at a later time. Counsel deferred, and instead urged the Court to enter its order approving the sale without further hearing or the taking of evidence. Nevertheless, the Court directed counsel for UAP to obtain an affidavit within 24 hours from a knowledgeable officer of UAP disclosing whether UAP did or did not receive notice of the impending sale and sales procedures. In that affidavit, Christopher K. Hildreth, vice president of United Agri Products, Inc., d/b/a UAP–MidSouth, swore that, to his knowledge, no one on behalf of UAP had received a service copy of the Debtor's Sale Procedures Motion, a copy of the Court's Order establishing the sales procedures, or notice of the sale of the Greenville warehouse prior to September 10, 2002.

Though it was not invited or authorized to do so, the Debtor then sent a counter-affidavit to the Court in which James B. Witthaus, the director of marketing and business development of Farmland Industries, Inc., detailed conversations and meetings he had had with Moses Vernon of UAP concerning the sale of the Greenville warehouse. Witthaus said he had negotiated a confidentiality agreement with Vernon so that Vernon could receive information regarding a number of fertilizer warehouses that the Debtor was intending

---

**5.** There was considerable debate at the September 10 hearing over whether UAP's right of first refusal amounts to an executory contract. The Court does not believe it is necessary to address that issue to resolve the question before the Court. However, the Court would note that the right of first refusal was only one part of the Fertilizer Handling Agreement entered into by Farmland Industries and UAP–MidSouth in August 2001, and the Debtor has not taken any steps pursuant to 11 U.S.C. § 365 to reject that Agreement.

to sell, including the Greenville warehouse. On or about May 31, 2002, according to Witthaus, in response to material he sent to Vernon, Witthaus received a bid of $1,420,000 for the Greenville warehouse from another individual on behalf of another ConAgra company; and that bid subsequently became the "stalking horse" bid—in the name of ConAgra Trade Group, Inc.—in the Debtor's Sale Procedures Motion that was filed on August 16, 2002. Witthaus further states that he met with Vernon and with Roy Richard, the representative of ConAgra Trade Group who was present at the auction on September 9, on July 31, 2002, to negotiate the details of the purchase of the Greenville warehouse by ConAgra Trade Group. He stated that he discussed sales procedures at that time with Vernon, including the Debtor's intentions to file a motion with the Court and obtain approval of the sales procedures.

While everything Witthaus says may be true, what his affidavit fails to say is painfully obvious and critical to this proceeding. What Witthaus fails to say is that UAP and/or Vernon were ever sent or ever received copies of the Debtor's Sale Procedures Motion and the Court's Order approving those procedures and setting the September 9 auction date and the September 10 hearing date. In fact, counsel for the Debtor candidly admitted at the hearing on September 10 that he did not believe that UAP was served a copy of the Sale Procedures Motion or the Order approving the sales procedures. Counsel was unable to state whether UAP had been given any notice of the September 9 auction or the September 10 hearing.

Despite this very obvious failure to give notice to UAP, many of the counsel present for the hearing on September 10 nonetheless urged the Court to give final approval to the high bid of $2,120,500 submitted by American. Counsel advanced two basic arguments in support of their position.

■ First, counsel argued that UAP should be deemed to have waived notice of the sales procedures because UAP and ConAgra Trade Group, the "stalking horse" bidder, are sister corporations of the larger ConAgra corporate entity, ConAgra Foods, Inc., and, since ConAgra Trade Group was the lead bidder and had notice of the sales procedures, UAP likely did have or should have had notice as well. The difficulty with this argument—which admittedly had some initial curbside appeal—is that there is no evidence or law to support it. The Court has gleaned from the statements of counsel and the Hildreth affidavit that UAP and ConAgra Trade Group are separate legal entities with offices in Greeley, Colorado, and Omaha, Nebraska, respectively. Obviously, ConAgra Trade Group knew of the sales procedures because it was the lead bidder and it participated in the auction process, but this is insufficient to raise an inference that UAP had notice of those procedures. There has been no suggestion or evidence that ConAgra Trade Group was UAP's agent for service of process or notice in this instance, in which case notice to ConAgra Trade Group might have been sufficient. *See In re Convertible Rowing Exerciser Patent Litigation,* 817 F.Supp. 434, 439 (D.Del.1993). Even if UAP and ConAgra Trade Group are sister corporations, this Court is unaware of any legal basis for finding—in this case—that serving notice on ConAgra Trade Group was sufficient for service of notice on UAP.

The Witthaus affidavit submitted by the Debtor does not dispel the Court's concerns that UAP was not provided notice of the sales procedures and auction process. Witthaus states that he met with Vernon, the UAP representative, on July 31, 2002,

at which time he discussed the sales procedures with Vernon and advised Vernon that a motion would be filed and the sales procedures would be approved by the Court. However, this meeting took place more than two weeks *before* the Debtor filed its Sale Procedures Motion on August 16, 2002, and was almost a month *before* the Court entered its Order on August 29, 2002, approving the auction and bid procedures and setting the September 9 auction date. As previously noted, the glaring omission in the Witthaus affidavit is reference to any service of the motion and the auction and bid procedures on UAP *after* the motion was filed and the order entered.

For these reasons, the Court cannot and will not find that UAP waived its right to notice of the auction and bid procedures and the sale of the Greenville property.

Secondly, these parties argue that the Court should approve the sale to American in order to preserve the "sanctity" of the bid process and procedures. They argue that a failure to approve American's bid in this instance could undermine the confidence of future bidders for other asset sales by the Debtor.[6] In this case, the parties argue, potential bidders will decline to bid in future asset sales because they will be uncertain whether their bids—despite being the highest and best bid at the auction—will be approved or will be subject to being upset by an overbid at the final hearing.

There are several fallacies in this argument. First and foremost, it suggests that the Court should condone a situation in which a party with a contractual right to purchase the Greenville warehouse—if it matches the highest offer received by the Debtor—would be deprived of that right

without notice, without an opportunity to submit a matching offer, and without an opportunity to be heard in the final hearing before the Court. The Court cannot in good conscience give its imprimatur to such a denial of basic due process. UAP has a contractual right to match the highest offer the Debtor otherwise receives for the Greenville warehouse. It is entitled to receive notice that the Debtor has received an offer from another potential purchaser, and it is entitled to either exercise its right to match that offer or to give up that right. Without proper notice, it could do neither. *See Matter of Wauka, Inc.,* 39 B.R. 734 (Bankr.N.D.Ga.1984), and the related case of *Jenkins v. Sosebee (In re Jenkins),* 74 B.R. 440 (Bankr.N.D.Ga.1987).

The argument also fails because approving the sale to American under these circumstances would violate the policies established by the Court of Appeals in the *Food Barn* case. As the Court there pointed out, a court should reopen bidding, and thereby upset the results of a properly conducted judicial auction, only if "there was fraud, *unfairness or mistake* in the conduct of the sale...or...the price brought at the sale was so grossly inadequate as to shock the conscience of the court." *Food Barn,* 107 F.3d at 564, quoting *In re Stanley Eng'g Corp.,* 164 F.2d 316, 318 (3rd Cir.1947), *cert. denied,* 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417 (1948) (emphasis added). The corollary of that is that the Court *should* upset the auction and reopen the bidding where, as in this case, a mistake has been made and there has been unfairness to a party. As already discussed, it would be a denial of due process, and thus inherently unfair, to approve this sale in light of the lack of

---

**6.** This sounds very much like the "floodgate" argument that courts have heard for many years.

notice to UAP. Moreover, a mistake has clearly been made—the Debtor mistakenly failed to notify UAP of the Sale Procedures Motion, the auction and bid procedures, and the final hearing.

This Court fully agrees that the integrity of the auction and bid process, as established in its previous Order, should be upheld. As the Court of Appeals noted, finality and regularity of proceedings are significant factors whenever the courts are involved in a sale of property, because "devotion to those principles encourages fervent bidding and ensures that interested parties will sincerely extend their best and highest offers at the auction itself." *Food Barn*, 107 F.3d at 564. In this case, the bidding process certainly measured up to those standards—there were more than 100 rounds of bidding on this particular asset, according to those who attended the September 9 auction. The bidding pushed up the purchase price by more than $700,000, or nearly 50 percent more than the opening offer by the lead bidder. The bid procedures have worked as anticipated in this case, and had it not been for the error in failing to notify UAP of the sale and the auction procedures, there would apparently have been no problems. However, the Court cannot sacrifice the due process rights of parties to the expediency of the auction and bidding procedures. Let there be no mistake that this Court will uphold auction and bid procedures in the future, unless there are mistakes or violations of such a serious nature that the auction and bid procedures must give way to weightier considerations.

And finally, the Court's decision here should not "frustrate the expectations" of American to purchase the property. The Sale Procedures Motion and the auction and bid procedures clearly spelled out that the sale would not be final until it was approved by the Court. The auction and bid procedures incorporated in the Court's August 29 Order specifically stated that "the Bankruptcy Court shall hold a hearing *to determine whether to approve the Winning Bid accepted by Seller* as the highest or best bid at the Auction..." Thus, American, along with all other bidders with notice of the procedures, knew that its bid was not final until it was approved by the Court. Inherent in the concept of a final hearing is also the concept that some other party might contest the highest or best bid received at the auction or might contest the auction and bid procedures; otherwise, there would be no point in having such a hearing. It is well established that a bankruptcy sale is not final until it has been approved by the court. *Payless Cashways*, 281 B.R. at 653. American cannot claim to be surprised by that rule, particularly when it was spelled out in the Court's August 29 Order.

 In applying the Eighth Circuit's "sliding scale" approach, it is clear that American's expectations have not become "sufficiently crystallized" so as to make it improper for the Court to reopen the bidding process. While American submitted the highest bid at the auction on September 9, the Court has not approved that bid because of the lack of notice to UAP. This is not a case of a potential bidder lying low until the bidding is closed and then attempting to jump in and upset the sale; this is a case of a party with a contractual right and property interest not receiving notice of the sale so that it could exercise that contractual right. "[T]he important notions of finality and regularity in judicial auctions are appeased if the court acts consistently with the rules by which the particular sale is conducted, in compliance with bidders' reasonable expectations." *Food Barn*, 107 F.3d at 565. Recognizing that this is a "deferential standard," the Court

of Appeals pointed out that the bankruptcy court must have "ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets." *Id.* at 565–66. In order to achieve that "satisfactory balance" in this case, the Court believes that the proper thing to do is to reopen the bidding and allow American and UAP to submit further bids, if they wish to do so.

Having determined that UAP must be afforded an opportunity to exercise its contractual right of first refusal on the Greenville warehouse, the Court should and will specify the procedures necessary to conclude this matter.

American has made a bid of $2,120,500 for the Greenville warehouse. UAP has, by counsel, announced in open court that it would match that bid. Therefore, the Debtor has received two valid offers of $2,120,500 for the property, and the Court considers these bids to be binding on the offerors. The Court will reopen the bidding, with the sole bidders to be American and UAP. If American declines to increase its bid, the bid will be awarded to UAP. If American chooses to increase its bid, UAP will be offered the opportunity to match that bid. This procedure will be followed until a final bid is received that is not matched by UAP. In order to assure the regularity and finality of this process, the Court will conclude the reopened bidding in open Court, commencing at 9:00 a.m. on September 24, 2002, in Courtroom 6A, where other hearings are already scheduled in the Farmland Industries Chapter 11 proceedings. This matter will be concluded before the Court takes up other matters for hearing.

Therefore, it is

**ORDERED** that a final hearing on the approval of the sale of the Greenville, Mississippi, fertilizer warehouse by the Debtor will be conducted at 9:00 a.m. on September 24, 2002, in Courtroom 6A, Charles Evans Whitaker United States Courthouse, Kansas City, Missouri, at which time the final bidding for the property will be concluded by the Court and final approval shall be given to the highest and best bid received.